[No. B192773. Second Dist., Div. Eight. June 9, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK SOTO CARRILLO, Defendant and Appellant.

[No. B199656. Second Dist., Div. Eight. June 9, 2008.]

In re FRANK SOTO CARRILLO on Habeas Corpus.

### COUNSEL

Diana M. Teran, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lawrence M. Daniels and Lauren E. Dana, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**RUBIN, J.**—Frank Soto Carrillo appeals from the judgment entered after a jury convicted him of first degree murder. We reject his claim that his constitutional rights were violated because the prosecution would not ask federal immigration officials to issue special visas for two exculpatory witnesses who lived in Mexico. We also reject his three claims of instructional error and affirm the judgment. In a companion petition for habeas corpus, Carrillo contends that his trial counsel had a prejudicial conflict of interest because he was also representing the son of a key prosecution witness who was facing a murder charge. We hold that no prejudice occurred and therefore deny the petition.

## FACTS AND PROCEDURAL HISTORY

At 8:00 p.m. on January 20, 2002, Daniel Ramirez was shot and killed in front of a taco stand in the San Fernando Valley. In July 2006, a jury convicted Frank Soto Carrillo of first degree murder for that crime. The evidence at trial showed that at least two different guns were fired at Ramirez, who sustained three gunshot wounds. Karina Orozco told the police that she heard shots being fired from three guns, but saw only one person who was holding a gun, and identified Carrillo as having been that person. She also signed a statement that she saw Carrillo kill Ramirez. Orozco also identified Carrillo at his preliminary hearing, but at trial backed off from her previous identifications and claimed she had been pressured by the police to identify Carrillo.

Lionel Rudy Chavarria also witnessed the shooting. He saw appellant standing in a group of men when he heard four or five gunshots. Chavarria saw sparks in front of people, including in front of Carrillo's torso. Chavarria gave this information to the police after being arrested 18 days later. He hoped that by doing so, he would get leniency. He did do some jail time, but thought he might have received a lighter sentence.[1]

A Los Angeles police gang detail officer testified that Carrillo and Ramirez were members of rival gangs. Carrillo belonged to Columbus Street and Ramirez was a member of Vincent Town. A Columbus Street gang member had been killed by a Vincent Town gang member nine days before Ramirez was killed and the officer believed that Ramirez was murdered in retaliation. Rosa Garcia, who once belonged to Columbus Street and was Carrillo's former girlfriend, testified that she was in an apartment with Carrillo 10 days after Ramirez was shot. According to Garcia, Carrillo asked if she had heard about what happened to Ramirez and said "we had it taken care of" and "I had that taken care of." The Vincent Town gang member who set all this in motion by killing a Columbus Street gang member was the ex-boyfriend of Garcia's sister and Carrillo told Garcia she could be next and that they were going to her house to look for the original shooter.

Based on this evidence, the jury found Carrillo guilty of first degree murder (Pen. Code, § 187, subd. (a)) and also found true allegations that he personally discharged a firearm, proximately causing great bodily injury and death (Pen. Code, § 12022.53, subd. (d)), personally used a firearm (Pen. Code, § 12022.53, subd. (b)), personally discharged a firearm (Pen. Code, § 12022.53, subd. (c)), and committed his crime for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(A)).[2] Along with two prior conviction allegations (§ 667.5, subd. (b)), this led the court to impose a state prison sentence of 25 years to life for the murder conviction, 25 years to life for the firearm discharge causing death or injury allegation, and 10 years for the gang benefit allegation. The remaining sentence enhancement allegations were dismissed.

Carrillo's primary issue on appeal stems from his unsuccessful efforts to have the prosecutor and the trial court help him obtain evidence from, or secure the trial attendance of, witnesses outside the United States. In February 2006, Carrillo brought a motion asking the court to appoint a commissioner

---

[1] Other witnesses testified inconclusively about Carrillo's presence at the scene, or to other facts that do not bear on our analysis. We have limited our statement of facts to the two eyewitnesses, however.

[2] All further undesignated section references are to the Penal Code.

to examine by way of written interrogatories two witnesses who lived in Mexico. (§ 1349 et seq.) A declaration from defense counsel stated that Abraham Prado and Maria Torrez, who lived in Mexico and could not be compelled to testify, were necessary and material witnesses. According to defense counsel, Prado was present when Ramirez was shot and asked Ramirez who did it. Ramirez answered with a "dying declaration" that the shooters "were the same as those that did it last time. When the victim was last shot, [Carrillo] was living in Mexico with . . . Torrez . . . ." The prosecutor filed a written opposition that raised the following grounds: (1) the statements supposedly made to Prado did not satisfy the requirements of section 1349 because they lacked foundation that Ramirez, who was shot in the back, even knew who had shot him; (2) the statements did not qualify as dying declarations under Evidence Code section 1242 because Prado told the police that Ramirez had said he was alright, meaning that Ramirez's statements were not made under the fear of impending death; and (3) because Prado's statements were not proper under section 1349, Torrez's testimony was rendered irrelevant. The trial court denied the motion on April 7, 2006, because it did not believe there was any enforcement mechanism in the event of perjury and because it believed the section 1349 procedure applied to only minor foundational matters, not to critical evidence of innocence or guilt that should be tested by cross-examination.

Carrillo followed this up with a motion to compel the prosecutor to ask federal immigration officials to exercise their discretion to issue a special "parole visa" to Prado and Torrez so they could enter the country for the sole purpose of testifying at trial. The motion was not supported by declarations or other evidence. Based on a federal appellate decision, Carrillo argued that the prosecution's refusal to even request those visas denied his due process rights to a fair trial and to present a defense. A later supplemental brief included an August 2004 letter from a defense investigator summarizing his interview of Prado. According to the unauthenticated letter, Prado was a friend of Ramirez and a distant relative of Carrillo. "He had a clear view of the shooters . . . . None of the shooters were Frank Carrillo." Prado ran to Ramirez, who said "the person who shot him was the same individual that had shot him in the arm six months earlier." Prado claimed he had tried unsuccessfully to explain this to the police and the prosecutor.

The prosecutor did not file a written opposition to this motion. The court denied the motion on April 24, 2006, for several reasons: (1) it did not believe the prosecution had a duty to help the defense locate and secure the attendance of witnesses; (2) the federal decision cited by Carrillo was inapplicable because it involved federal prosecutors and federal immigration officials, while this was a prosecution by the state, which had no connection

to or authority over the immigration department; (3) Carrillo cited no authority concerning the so-called parole visas, but the court's independent research turned up two federal administrative regulations that showed such visas were issued subject to the immigration department's sole discretion, meaning there was no guarantee a prosecution request would even be honored; and (4) the motion was supported by no evidence showing the witnesses' citizenship, immigration status, possession or nonpossession of a green card or visa, no evidence that the witnesses ever tried on their own, but failed, to obtain visas, and no explanation for defense counsel's delay in attempting to secure the attendance of those witnesses since August 2004.

## DISCUSSION

### 1. *Denial of the Visa Request Motion Was Proper*

In *U.S. v. Theresius Filippi* (1st Cir. 1990) 918 F.2d 244 (*Filippi*), the court held that federal prosecutors violated a criminal defendant's constitutional rights to due process and to the compulsory attendance of witnesses by denying the defendant's request that they ask federal immigration officials to grant an entrance visa to an Ecuadorian national who had exculpatory evidence in the defendant's trial for transporting cocaine. (*Id.* at pp. 247–248.) Because the defendant went to trial before the issue was resolved in the trial court, however, the federal appellate court held that the constitutional rights violations had been waived. (*Id.* at p. 248.)[3] Pointing to somewhat analogous California authority, Carrillo contends the same rule should apply here.

We will assume for discussion's sake that Prado and Torrez were material defense witnesses who possessed important exculpatory evidence. We will also assume, but do not decide, that in the abstract, a refusal by the prosecution or the court to make sure that entry visas were at least requested from federal immigration officials for such witnesses violates a defendant's constitutional rights to due process and a fair trial. Even so, the record from below and the arguments made on appeal compel us to affirm the trial court's ruling here.[4] In *Filippi, supra,* 918 F.2d 244, the evidence showed that the

---

[3] Respondent contends that Carrillo also waived the issue by proceeding to trial. We agree with Carrillo that no waiver occurred because he did not go to trial until his motion had been denied and he made it clear that he did not intend to waive his objections by doing so.

[4] Although we affirm on this ground, we do not believe the trial court should have so easily dismissed Carrillo's contentions. It seems a strange notion indeed to let the prosecution alone decide whether it will request a special immigration visa for exculpatory witnesses who are foreign nationals. Such unfettered discretion is ripe for abuse and can hardly be reconciled with commonly accepted notions of fair play and equal justice. The trial court's belief that a duty to request a visa under the proper circumstances does not exist because state courts and

defendant's wife flew to Ecuador, asked the witness to testify for her husband, and obtained his agreement to do so. The witness went to the American embassy and asked for, but was denied, an entrance visa. The defendant's lawyer wrote the United States attorney and asked for her cooperation, but she did not respond. Upon request by the defense, the court wrote a letter to the embassy in Ecuador and asked for assistance, but got no results. Defense counsel then wrote to and phoned immigration officials, but was told federal prosecutors had to request the visa.

As the trial court in this case pointed out, Carrillo's motion was not supported by any evidence. Though some factual assertions were made by way of argument, no evidence was placed before the trial court that explained the witnesses' immigration status, showed that any steps had been taken to secure regular visas, or otherwise showed that their attendance would not be possible without the requested court orders. The unauthenticated letter from the defense investigator was silent as to Prado's immigration status, but mentioned that he had crossed back and forth from Mexico, leading the trial court to infer that there might in fact have been no impediments to his ability to come here. Furthermore, Carrillo's motion did not cite, discuss, or analyze the federal immigration provisions that apply in this case. While he cites two federal immigration regulations in his appellate brief, he has still failed to discuss or analyze their applicability to this case. As a result, their applicability and hence their efficacy are waived as issues. (*People v. Beltran* (2000) 82 Cal.App.4th 693, 697, fn. 5 [98 Cal.Rptr.2d 730].) Because there was insufficient evidence to support the motion below, and because Carrillo has failed to make proper argument on appeal about the applicable federal immigration provisions, we affirm the trial court's order.[5]

---

prosecutors have no authority over federal immigration officials, and because there is no guarantee a request will be honored, strikes us as begging the essential issue: whether the prosecution should at least request the visa when warranted, instead of operating without guidelines or oversight, raising the specter of blanket denials of visa requests for defense witnesses, while requests for prosecution witnesses are routinely made. We also reject the trial court's reliance on decisions such as *In re Littlefield* (1993) 5 Cal.4th 122 [19 Cal.Rptr.2d 248, 851 P.2d 42] and *People v. Rance* (1980) 106 Cal.App.3d 245 [164 Cal.Rptr. 822], which concerned the prosecution's lack of a duty to assist the defense during discovery. Because this was not a discovery issue, such decisions are inapplicable. However, we leave for another day the issue whether a proper factual showing might oblige the prosecution to make a good faith request for a special entry visa in order to allow a foreign defense witness to enter the United States.

[5] To the extent Carrillo contends he has raised as an issue the trial court's denial of his section 1349 motion for a commission to examine the witnesses, we hold he has also waived that issue. His appellate brief mentions the issue only in passing, but does not cite, discuss, or analyze the comprehensive statutory scheme for seeking or opposing such commissions and does not address any of the legal grounds relied on by the trial court when denying that motion.

## 2. *Instructional Error Claim for the Allegation of Firearm Use Causing Death or Great Bodily Injury*

█ Section 12022.53, subdivision (d) enhances the sentence of defendants who, while committing murder and other specified felonies, "personally and intentionally discharge[d] a firearm and proximately cause[d] great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice . . . ." The jury in this case found such an allegation true as to Carrillo, but he contends the court erred by failing on its own motion to give a certain instruction defining proximate cause.

As relevant here, the jury was instructed that the prosecution had to prove, among other facts, that the "defendant's *or* a perpetrator's act caused great bodily injury to or the death of a person" and that "[a]n act causes great bodily injury or death if the injury or death is the direct, natural, and probable consequence of the act and the injury or death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence."

Carrillo contends that, pursuant to *People v. Bland* (2002) 28 Cal.4th 313 [121 Cal.Rptr.2d 546, 48 P.3d 1107] (*Bland*), the court was obligated to sua sponte instruct the jury with CALJIC No. 3.41, which states, "There may be more than one cause of the great bodily injury or death. When the conduct of two or more persons contributes concurrently as a cause of the great bodily injury or death, the conduct of each is a cause of the great bodily injury or death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the great bodily injury or death and acted with another cause to produce the great bodily injury or death. [¶] If you find that the defendant's conduct was a cause of the great bodily injury or death to another person, then it is no defense that the conduct of some other person, even the injured [or] deceased person, contributed to the great bodily injury or death." (See 28 Cal.4th at p. 335.) Absent that clarification, Carrillo contends the jury could have found the allegation true based solely on the acts of any coperpetrators without determining that his conduct proximately caused injury or death.

█ The defendant in *Bland* and another man fired shots into a car that killed one person and wounded two others. It was unclear whether the

defendant or his accomplice fired the rounds that hit the two wounded victims. The defendant was found guilty of murder and attempted murder, along with the enhancement under section 12022.53, subdivision (d).[6] The trial court instructed the jury in the language of subdivision (d), but failed to give an instruction defining proximate cause. The Court of Appeal reversed, reasoning that the enhancement could not be found true unless the defendant personally fired the bullets that struck the victim. The Supreme Court rejected the Court of Appeal's reasoning, holding that the statute is satisfied even if the bullets did not hit the victim so long as, under the broad standard of proximate cause, the defendant's act of firing the gun was a cause of the injuries or death. (*Bland, supra,* 28 Cal.4th at pp. 336–338.) As part of its holding, the *Bland* court addressed the instructional requirements for proximate cause under subdivision (d). ■ According to the *Bland* court, CALJIC No. 17.19.5 correctly defined proximate cause as follows: " 'A proximate cause of great bodily injury or death is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the great bodily injury or death and without which the great bodily injury or death would not have occurred.' " (28 Cal.4th at p. 335.) If there is more than one cause of injury or death, then CALJIC No. 3.41 should also be given. (28 Cal.4th at p. 335.)

Despite the trial court's error, the *Bland* court found it harmless because proximate cause is a broader concept than jurors might assume and the jury was therefore unlikely to find proximate cause where none existed. Because any confusion could have only helped the defendant, the Supreme Court did not reverse the trial court's judgment. (*Bland, supra,* 28 Cal.4th at p. 338.)

Based on this, Carrillo contends that instructional error occurred. We agree. The facts here showed that Carrillo was one of several persons who shot at Ramirez, who was struck by rounds fired from two or three different guns. There was no evidence that Carrillo fired one of those guns. By modifying the instruction to state that the allegation was true if the conduct of Carrillo *or* a coperpetrator harmed Ramirez, and then by failing to instruct the jury that concurrent causes could operate together to determine proximate cause, there was a likelihood that the jury could have found the allegation true without finding that Carrillo's conduct was one of those causes. (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156 [35 Cal.Rptr.3d 373] [test for instructional error is whether jury would likely misunderstand or be misled by instruction].) However, as set forth below, under the applicable standard of

---

[6] When we hereafter mention subdivision (d), we are referring to that subdivision of section 12022.53.

review for constitutional error, the error was harmless beyond a reasonable doubt. (*Id.* at p. 1157.)

Even if error occurred it was not prejudicial if the jury necessarily found the missing element true under other instructions. (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 18 [44 Cal.Rptr.2d 796]; *People v. Matta* (1976) 57 Cal.App.3d 472, 488–489 [129 Cal.Rptr. 205] [defendant convicted of murder contended court erred by not instructing on attempted murder; jury's finding that defendant proximately caused victim's death as part of murder verdict meant that key issue concerning need for attempted murder instruction—whether defendant's assault of victim was proximate cause of his death—was necessarily resolved against defendant, making error harmless].) That is precisely what happened here. The jury was instructed that, in order to find Carrillo guilty of murder either directly or as aider and abettor, it had to find that *Carrillo's* acts caused Ramirez's death. As part of that, the jury was told that "[a]n act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence." This is the definition of proximate cause approved in *Bland, supra,* 28 Cal.4th at page 335. In holding that proximate cause under subdivision (d) did not require proof that the defendant actually fired the shot that harmed his victim, the *Bland* court relied on *People v. Sanchez* (2001) 26 Cal.4th 834 [111 Cal.Rptr.2d 129, 29 P.3d 209] (*Sanchez*), which held that a defendant who joined with others in firing at a victim was the proximate cause of death for purposes of the murder conviction even when it was impossible to tell who fired the fatal shot. (*Bland, supra,* at pp. 337–338, citing *Sanchez, supra,* at pp. 848–849.)

█ Applying that reasoning here, when the jury found Carrillo guilty of murder, it found that *he* proximately caused Ramirez's death. Regardless of whether the jury found Carrillo guilty because he fired the fatal shot or aided and abetted the murder by firing *at* Ramirez, under *Bland* and *Sanchez,* he was a proximate cause of the death. Accordingly, the jury could not have misunderstood the instructions in a way that would have resulted in a finding of proximate causation on an improper basis, making the error harmless. (*Bland, supra,* 28 Cal.4th at p. 338.)

3. *Failure to Give Instruction on Flight*

█ Several witnesses saw Carrillo running from the scene of the shooting, but the court did not instruct the jury with CALJIC No. 2.52, which states that flight from a crime scene is evidence of guilt, but is not sufficient

by itself to establish guilt. Carrillo contends the trial court had a sua sponte duty to give that instruction. Even if error occurred, because the evidence of Carrillo's guilt rested primarily on eyewitness identification and statements attributed to him about his participation in the crime, not on his flight from the scene, we hold that the error was harmless. (*People v. Sheldon* (1967) 254 Cal.App.2d 174, 181 [61 Cal.Rptr. 778].)

### 4. *The Reasonable Doubt Instruction Was Proper*

■ The jury was instructed on the meaning of reasonable doubt with CALCRIM No. 220, which states that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." Carrillo objected below that the instruction should be modified to also state that "abiding conviction" means "convincing you to a near certainty of the truth of the charge." He contends the trial court erred by not doing so. Because the propriety of the instruction given has been upheld many times, we affirm. (*People v. Staten* (2000) 24 Cal.4th 434, 456–457 & fn. 5 [101 Cal.Rptr.2d 213, 11 P.3d 968].)

### 5. *The Habeas Corpus Petition*

■ The constitutional right to the effective assistance of counsel includes a correlative right to representation free from conflicts of interest. (*People v. Clark* (1993) 5 Cal.4th 950, 994 [22 Cal.Rptr.2d 689, 857 P.2d 1099] (*Clark*).) Carrillo has filed a separate habeas corpus petition, contending that his trial lawyer, Dale Atherton, had a conflict of interest during the trial because he was then representing Garcia's son, who had been charged with a gang-related murder. Carrillo contends that his petition should be granted because there was an actual conflict of interest and because the trial court did not ask him about that issue.

The record shows that Atherton was appointed in September 2005 to represent Oscar Bonilla on a gang-related murder charge. At a June 19, 2006, court hearing in this case, Atherton and the prosecutor told the court that Atherton had only recently learned Bonilla was Garcia's son and wanted to bring that potential conflict of interest to the court's attention. Atherton told the court that he talked to Garcia by phone, told her he was representing Carrillo, and explained that no matter how she testified in this case, it would not affect his representation of Bonilla. He said he had made her no promises, did not intimidate her in any way, and made it clear that he would represent her son to the best of his ability. Atherton told the court he asked Garcia to do

nothing more than tell the truth. Atherton's investigator interviewed Garcia and her story had not changed from her initial statements to the police. The court and the prosecutor agreed that there was no conflict of interest. Carrillo was present at the hearing, but said nothing.

In his habeas corpus petition, Carrillo submitted a declaration stating that he told Atherton he wanted a new lawyer, but Atherton said it was too late. Carrillo said he had been unaware he had a right to another attorney if a conflict of interest existed and that neither the court nor counsel questioned him about the potential conflict at the June hearing. Had he been asked to waive the potential conflict, he would have declined and insisted on getting new counsel. In a declaration submitted with respondent's opposition to the habeas corpus petition, Atherton declared that he had no divided loyalties due to representing Carrillo and Bonilla, and that although Carrillo might have inquired about new counsel due to the length of trial preparations, that was before Atherton learned of the potential conflict and had nothing to do with that issue.

 Because Carrillo did not object below, under the federal Constitution he must show that an actual conflict of interest adversely affected his lawyer's performance. (*Clark, supra,* 5 Cal.4th at pp. 994–995.) A more rigorous standard of review is applied under the California Constitution, however. Proof of an actual conflict is not required and a potential conflict may require reversal if the record supports an informed speculation that Carrillo's right to effective representation was prejudicially affected. This does not require Carrillo to show that he would likely have been acquitted absent the conflict. Instead, we examine the record to determine whether defense counsel failed to represent defendant as vigorously as he might have had there been no conflict. The grounds to believe that such prejudice occurred must be discernible and the informed speculation of prejudice may be dispelled by examination of the trial record. (*Id.* at p. 995.)

 Although current or former representation of a prosecution witness may well give rise to a conflict of interest for defense counsel, there is ordinarily no conflict if the lawyer has not received pertinent confidential information from the witness. (*People v. Cornwell* (2005) 37 Cal.4th 50, 75 [33 Cal.Rptr.3d 1, 117 P.3d 622].) There is no allegation that Atherton possessed confidential information from either his client Bonilla or from Bonilla's mother, Garcia, and there are no California cases holding that current representation of a prosecution witness's relative creates a conflict of interest.[7] We therefore doubt that a conflict existed, especially where the trial

---

[7] Carrillo does cite to one New York civil case where a conflict was found on those facts. (*People v. Krausz* (1994) 84 N.Y.2d 953 [620 N.Y.S.2d 821, 644 N.E.2d 1377, 1378].)

court heard and accepted the explanations and viewpoints of both Atherton and the prosecutor. (*Clark, supra*, 5 Cal.4th at pp. 1001–1002.)

Assuming for discussion's sake only that a conflict existed, our examination of the record shows that no prejudice occurred. Carrillo contends prejudice existed because Atherton did not cross-examine Garcia about the fact that her son was facing gang-related murder charges. According to Carrillo, this line of questioning could have created an inference that Garcia was cooperating with the prosecution in order to obtain leniency for her son, and could have been used to show that her family was still connected with gangs, thereby impeaching her statement on direct examination that she left the Columbus Street gang years before. As proof of the former, Carrillo's petition includes a minute order showing Bonilla eventually pleaded guilty to manslaughter.

We are not persuaded by either contention. Carrillo does not dispute that Garcia's trial testimony about his admissions was consistent with the statements she gave to the police before Atherton began to represent Bonilla.[8] With that in mind, it would be impossible to show her testimony was somehow influenced by her son's subsequent arrest. As for Garcia's gang affiliation, Atherton asked Garcia whether she was in a gang, and Garcia said she was, thereby impeaching her on that topic. Finally, we have reviewed the record of Garcia's testimony and are satisfied that Atherton examined her vigorously. He questioned her about a police report where she said Carrillo had simply been trying to scare her, got her to admit to lying to her friend, Jonetta Jones, about certain information, and got Jones to confirm that Garcia's mother had impersonated Garcia during certain police interviews.

Based on this, we conclude that no prejudice occurred from Atherton's supposed conflict of interest. Because we hold that no prejudice occurred under the more rigorous California standard, our holding applies with equal force under the United States Constitution, which also requires proof that the conflict adversely affected counsel's performance. As for the court's failure to ask Carrillo about the conflict and whether he wished to waive it, because the conflict did not affect Atherton's performance, reversal is not required. (*Clark, supra*, 5 Cal.4th at p. 999.)

---

[8] Carrillo does contend that Garcia's trial testimony added new and more unfavorable information about gang rivalries and a gang threat on her life.

## DISPOSITION

For the reasons set forth above, the judgment is affirmed. The petition for writ of habeas corpus is denied.

Cooper, P. J., and Flier, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 24, 2008, S165201. Corrigan, J., did not participate therein.