Filed 1/6/14  P. v. Scott CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARCUS SCOTT, JR. et al.,<br><br>Defendant and Appellant. | C068543<br><br>(Super. Ct. No. 10F00253) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARQUEL DIXON,<br><br>Defendant and Appellant. | C068544<br><br>(Super. Ct. No. 10F00253) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RONALD GRANT,<br><br>Defendant and Appellant. | C068924<br><br>(Super. Ct. No. 10F00253)<br><br>MODIFICATION OF<br>OPINION |

1

THE COURT:

It is ordered that the opinion filed in this case on December 10, 2013, be modified as follows:

On page 34, footnote 12, strike the entire footnote as written, and replace it with the following:  At oral argument the People repeatedly asserted that Dixon did not challenge his particular sentence or request remand; in fact he did both.  The People claim these assertions related only to Dixon's constitutional claim, not his state law claim (regarding the trial court's exercise of its discretion).  Other than arguing forfeiture, however, the People did not address the state law claim at argument, focusing instead on the constitutional claim which we need not reach, as explained *post*.

This modification does not change the judgment.

THE COURT:

NICHOLSON, Acting P.J.


MAURO, J.


DUARTE, J.

Filed 12/10/13  P. v Scott CA3 (unmodified version)

NOT <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C068543 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F00253) |
| v. | |
| MARCUS SCOTT, JR. et al., | |
| Defendant and Appellant. | |
| THE PEOPLE, | C068544 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F00253) |
| v. | |
| MARQUEL DIXON, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C068924 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F00253) |
| v. | |
| RONALD GRANT, | |
| Defendant and Appellant. | |

1

On the evening of December 15, 2009, defendants Marcus Scott, Marquel Dixon, and Ronald Grant approached Perell Marquis Waters as he sat in his car in the parking lot of the Woodbridge Apartments. Scott and Grant fired several times, killing Waters. Three separate juries hearing a single trial found Scott, Dixon, and Grant guilty of first degree murder with a robbery special circumstance and attempted robbery, both counts with firearm and gang enhancements. All three defendants were sentenced to life in prison without the possibility of parole.

On appeal, Scott and Grant challenge the sufficiency of the evidence of attempted robbery, claiming the plan changed from robbery to murder, requiring reversal of the special circumstance and the attempted robbery charge. Dixon concedes the evidence is sufficient as to him for attempted robbery, but contends there is insufficient evidence he aided or abetted Scott and Grant or conspired with them as to attempted robbery, so his murder conviction must be reversed. He also contends the special circumstance must be reversed because he was not a major participant and did not act with reckless indifference.

Scott and Grant contend there was instructional error on the causation portion of the instruction for the enhancement discharging a firearm and causing death or great bodily injury. Scott contends the trial court failed to follow the proper procedure in denying his *Batson-Wheeler*[1] motion and applied the wrong standard in denying his motion for a new trial. Grant contends his statements during police interrogation were not voluntary and the trial court erred in admitting them. Scott and Dixon contend, and the People agree, their parole revocation fines must be stricken. Dixon contends his case must be remanded for resentencing as the trial court was unaware of its discretion to sentence him to 25 years to life instead of life without parole.

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

As we will explain, we find error only as to Scott and Dixon's parole revocation fine and Dixon's sentencing. We order the parole revocation fines stricken as to Scott and Dixon, order correction of a clerical error on Scott's abstract of judgment, and remand Dixon's case for resentencing. In all other respects, we affirm the judgments as to Scott and Dixon. We affirm the judgment as to Grant in its entirety.

## FACTS

*The Gang Feud and Prior Shootings*

Robert Quinn, a detective in the gang suppression unit, testified about African-American criminal street gangs in Sacramento. Sacramento is a "red" town; the Bloods outnumber the Crips by three-to-one. The three major groups of Bloods are the Meadowview Bloods, the Oak Park Bloods, and the Del Paso Heights Bloods. Because there are so many Bloods, there is a lot of Blood-on-Blood crime, feuds between subsets. The largest subset of the Oak Park Bloods is FAB, Fourth Avenue Bloods, now known as "Fuck A Bitch." The primary activities of FAB are robberies, shootings, gun possession, and narcotic sales. The Elm Street Bloods is a subset of the Del Paso Heights Bloods.

Grant and Scott are active FAB members. Jumal Gray is a Blood, although his set is unknown. Quinn did not have enough evidence to say that Dixon was a gang member. Perell Mark Waters, the victim, was a member of the Elm Street Bloods.

A series of violent crimes between FAB and the Elm Street Bloods began in 2009. It began with the robbery of Tommy Martinez, known as Tommy Guns, a member of the Beast Mob or Elm Street Bloods. This crime was followed by a fistfight, a running gun battle, and several unreported shootings. Arguments or problems between gangs are known as funks; the individual gang members have beefs.

In November, Scott, known as Nootie or Nutchy, suffered a gunshot wound to his shoulder when his car was shot at during one of the shootings. Grant was shot at the

3

same day, although he was not hit. They believed the Elm Street Bloods were responsible, especially Waters and two others known as Baby Joe and G-Parkway.

Scott discussed the shooting with Lavola Fields. Fields is the mother of Latorria Jones, who was Scott's girlfriend at the time (they later married). Scott was angry about the shooting because his daughter could have been in the car and killed. Fields told him to "let it go." Scott said no; he was from FAB and "we don't play that way." Fields told the police she heard Scott threaten to kill Waters and Baby Joe. "I'm going to get them. Them niggas is dead. I'm not playing." At trial, she claimed she had lied because she was angry with Scott. She testified Scott said he would retaliate and Grant said he had Scott's back. She told the police that Grant had said, "FAB, you know I got your back, whatever you need done, I got it--I got it, you know. We keep 'em ready."

Two weeks before the shooting, Fields heard clicking coming from one of her bedrooms. She knew it was a gun. She told the police she walked in and saw Scott with a nine-millimeter gun. He said it was the type of gun used earlier to shoot him. At trial, Fields said she also lied about seeing the gun because of her anger at Scott.

*Text Messages*

The police went through thousands of text messages between the parties involved. There were several text messages relating to robberies or "licks." Some were about retaliating. On November 27, 2009, Grant texted Scott, "This little bitch I know is having a party. We can try catch one of the Elm Street niggas slippin'." On December 10, there were several text messages about Waters winning $4,000 at dice. The day of the shooting, Grant texted Scott, "So wassup, blood? We keep saying we fittin' to get blood, and we ain't did shit, blood." The next text message read, "Don't matter. We always going to be able to get him. I got the address and shit, but we hittin' Mark tonight."

4

*The Shooting*

On December 15, Grant texted Gray, who went to his apartment in his white Buick.[2]  Gray also picked up Scott.  Scott had a .22-caliber semiautomatic gun and Gray gave his nine millimeter to Grant.  Later, they met up at May Street, "Cuz that's where we kick it at."  They smoked weed and Dixon joined them.  They left in Gray's car to "hit a lick," commit a robbery.  It was planned right there; Gray thought it was a spur of the moment decision.  They discussed it in the car.

First, they went to the AM/PM where each person gave Gray $5 for gas.  Scott went inside to pay for it.  He was wearing a multicolored jacket.  Then they went to the Woodbridge Apartments to do a robbery.  Grant still had Gray's gun.  Gray assumed it would be used in the robbery.  At the apartments, Grant told Gray where to park.  Gray understood he would be the getaway driver and backed into someone's parking space.  The other three got out and walked behind the apartments.  Gray stayed in the car and smoked marijuana.

The next thing Gray heard was gunshots.  Dixon came running to the car before the shots stopped.  He said he ran over a girl.  Dixon said "go," and Gray drove away slowly; Scott and then Grant jumped in.

Miguel McGrigg lived at the Woodbridge Apartments and Waters was his neighbor.  He was in his car about to go to the store when he saw Waters walk by with about four other men.  A few seconds later he heard shots, about a dozen.  He saw two shooters; one on either side of Waters's car.  The one on the passenger side was tall and thin and wore a multicolored jacket; the one on the driver's side was shorter.[3]  The

---

[2]  Gray pled to attempted robbery and voluntary manslaughter for the benefit of a gang. He received a sentence of 21 years and six months in prison in exchange for testifying truthfully for the People.

[3]  Grant is six-foot four-inches and Scott is five-foot seven-inches.

5

bullets went through the driver's windshield, but none appeared to hit Waters. Waters got out of the car and looked at one of the shooters. Waters was then shot. McGrigg saw one man run when the shooting started.

After the shooting, McGrigg went to his apartment and had his wife call the police. He then went to Waters, and saw bullet holes in his stomach. A white car left quickly.

When the police arrived, Waters was lying on his back next to his car. The engine was running and the car was pushed up against another car. Waters was breathing, but did not respond to questions. He was bleeding from bullet holes on the left side of his body. There were nine bullet holes in the windshield and four in the driver's window. The police found seven .22-caliber casings and four nine-millimeter casings.

Waters was pronounced dead soon after he arrived at the hospital. The cause of death was a gunshot wound to the abdomen that hit his large and small intestines and his aorta (the largest blood vessel), cut his ureter in half, hit his liver, and then exited his body. Waters had seven gunshot wounds.

*After the Shooting*

After the shooting, Gray drove to Dixon's nearby apartment complex and dropped him off. Gray heard police sirens so he returned to the apartment complex. Grant called Dixon to find out which apartment was his and Dixon, who had changed clothes, came out to meet them. Everyone was panicking. Gray saw Grant wash his hands with bleach. At the preliminary hearing, Gray testified both Grant and Scott washed their hands with bleach. They said, they "got him." Grant said, "My cousin said rock, so I rocked." Dixon was "freaked out." No one talked about a robbery. Gray thought he and Dixon "got played." They were told it was going to be a robbery when it was a murder.

Dixon's girlfriend, Ciara Gore, and his sister lived in the apartment. Gore told the police she was in bed when Dixon called and asked her to open the door. Five men rushed in, all scared and nervous. One had a gun. They washed the gun with bleach.

6

Dixon maintained he did nothing and Grant confirmed this. Gore told the police that Grant said he caught Waters by his car and shot him. They shot him because he was from Elm Street. No one mentioned a robbery.

That night, shots were fired into Scott's car.

Grant and his girlfriend went to a Days Inn after the shooting. They went to the motel because of what happened to Waters. Grant was afraid due to threats. The next night, Grant sent a text message, "Got a nine for sale, asking 50."

*Defendants' Statements*

The police interrogated all three defendants and the videotape of each interrogation was played to that defendant's jury.

The police questioned Dixon twice. In the first interview he denied any involvement in the shooting; he claimed he was with his "baby mama" that night, "whatever night y'all are talking about." He eventually admitted he was present at the shooting in the second interrogation. He knew both Scott and Grant had guns. They saw Waters and someone else walk to his car and followed them. Dixon was behind Scott and Grant. Grant said something to Waters's companion who replied he did not want any problems. Scott and Grant pulled out their guns and started firing. Both fired. The man with Waters ran and Dixon ran. Dixon bumped into a girl as he ran. The shooting was still going on.

Dixon said the robbery was Scott's idea. Waters had marijuana and money from a dice game. They told him that if he came, he would get half. Dixon was "definitely" not there to kill Waters. Afterwards, he asked what happened and they told him to shut up. He asked to be taken to his sister's. At his sister's, Grant and Scott washed up and asked for bleach. Dixon thought they shot Waters for payback.

The police also questioned Grant twice. The first time, he denied any involvement and suggested that Scott did the shooting by himself. The second interrogation was lengthy and Grant eventually admitted his involvement. Grant said they went to the

7

apartments to rob Waters because he had money.  When Waters came out, however, Scott wanted to shoot him.  Grant gave the nine-millimeter gun to someone named Kev.  When Scott shot, Grant ran.

Later, Grant admitted there was no Kev.  Only he, Scott, and Dixon were present.  Dixon ran.  Grant stood at the window of Waters's car and told him he "needed everything."  Scott said no and started shooting.  Grant said Scott took the gun from him.  Grant eventually admitted he shot into the car, but claimed he did not hit Waters.  He said Scott took his gun and fired three more times.

Scott was questioned only once.  He said he knew nothing about Waters's murder except that people said he was supposed to have done it.  Scott repeatedly denied he was at the shooting, even though the police told him that witnesses had said he was there.  His denials continued when the police confronted him with cell phone records showing that his phone was in the area.  He claimed he was in the south area cheating with another girl.  Later, he said he did not know if he was in the south area.

Only Scott presented a defense at trial.  Tiffany Miller, the mother of Scott's child, testified Scott was at her apartment that night from 8:30 until 11:00.

*Convictions and Sentencing*

The jury found Grant guilty of first degree murder (Pen. Code,[4] § 187), with a robbery special circumstance (§ 190.2, subd. (a)(17)(A)), and attempted robbery (§ 664/211).  The jury found the firearm (§ 12022.53, subd. (b), (c) & (d)) and gang (§ 186.22, subd. (b)(1)) enhancements true as to both counts.  At sentencing, the trial court found Grant in violation of probation, terminated probation, and sentenced him to the midterm of four years in prison on a prior burglary charge.  On count one, the murder charge, the court sentenced Grant to life without parole, plus 25 years to life in prison on

---

[4] Further undesignated statutory references are to the Penal Code.

the greatest firearm enhancement, plus ten years for the gang enhancement. The court stayed sentence on count two, the attempted robbery, pursuant to section 654.

The jury found Scott guilty of first degree murder (§ 187), with a robbery special circumstance (§ 190.2, subd. (a)(17)(A)), and attempted robbery (§ 664/211). The jury found the firearm (§ 12022.53, subd. (b), (c) & (d)) and gang (§ 186.22, subd. (b)(1)) enhancements true as to both counts. At sentencing, Scott made an oral motion for a new trial, which the court denied. The court sentenced Scott to life without parole on count one, the murder, plus 25 years to life in prison on the greatest of the firearm enhancements, plus 10 years in prison for the gang enhancement, and stayed sentence on count two, attempted robbery.

The jury found Dixon guilty of first degree murder (§ 187), with a robbery special circumstance (§ 190.2, subd. (a)(17)(A)), and attempted robbery (§ 664/211). The jury found true firearm enhancements that Dixon violated section 186.22, subdivision (b)(1) and a principal personally used the firearm causing great bodily injury or death (§ 12022.53, subd. (b), (c) & (d)), but found the allegation that Dixon was personally armed with a firearm not true. The jury also found the gang enhancement true. (§ 186.22 (b)(1).) The court sentenced Dixon to life without parole on count one, the murder, plus 25 years to life in prison for the most serious firearm enhancement. The trial court did not impose the gang enhancement. The court stayed sentence on count two, attempted robbery, pursuant to section 654.

## DISCUSSION

### I

### *Scott's Contentions*

A. *Wheeler-Batson Motion*

Scott contends the trial court erred and violated his constitutional rights by failing to follow the proper procedure in responding to his claim that the People had exercised

9

peremptory challenges to two prospective African-American jurors in a discriminatory manner.

1. Background

Scott is African-American. There were three African-Americans on the jury panel.[5] The first was a woman, P.M., who had been a school bus driver for 20 years. Her brother had been arrested for "hot prowls" or breaking and entering 13 years earlier and had been sentenced to 113 years in prison. The trial court asked if he had a lot of priors and P.M. responded, "Three strikes." When the court asked how she felt about the sentence, she replied, "That's the life he chose." P.M. thought her brother had been treated fairly. When the People questioned her about her brother's long sentence, P.M. said, "I'll never see him again." She said she had only limited contact with him as he lived in Southern California. He called her parents when he was in trouble. Her parents had accepted his sentence. P.M. said she could be fair.

M.C. was a male African-American prospective juror. He was a security manager for Radio Shack, and had been a master-at-arms in the military. His son had received a citation for boarding light rail without a ticket. M.C. thought his son was treated fairly. He said he could be a fair juror.

The defense excused M.C. and the People excused P.M.

S.R. was another African-American female on the jury panel. She had a master's degree in social work and worked for the Department of Public Health. This job was new; she had previously worked on a statewide domestic violence program. She had worked in the jail 30 years earlier, processing paperwork, and had worked for the Department of Justice over 20 years earlier. Her brother had been arrested the prior year for armed robbery, involving the use of a knife against her mother. His case was still

---

[5] The record does not reveal the race of any prospective or actual juror other than these three.

pending; he was being prosecuted by the Sacramento County District Attorney's Office and S.R. thought he was treated fairly. When the trial court asked if anything about his case would spill over to the current case, S.R. hesitated before answering no. Under questioning by the People, S.R. said she had not visited or talked to her brother in a year. She had intended to do so, but had not. She said she could be fair. She could put aside the circumstances of her brother's case because she knew that he did what he did under the influence of drugs.

The People excused S.R.

The defense made a *Wheeler-Batson* motion. Counsel stated his first concern was the propriety of the People's dismissal of P.M. because he believed her answers were pro-prosecution. Then the People had dismissed S.R. although "her background is basically total law enforcement."[6] S.R. was not particularly sympathetic to her brother and there was nothing in her background to believe that she favored Scott. The defense expressed concern that the People challenged these two jurors due to their race.

The trial court stated it was "aware of the defense burden in showing that the jurors are being challenged for a racially discriminatory reason." It found the People could consider the long imprisonment of P.M.'s brother to be a concern; she had brought up three strikes and said she would never see him again. That provided a race-neutral reason to excuse P.M.

The court also found a race-neutral reason to exclude S.R. Although her mother was the victim of her brother's armed robbery, she intended to see him in jail. He was housed in the same jail as Scott. S.R. excused her brother's committing his crime under

---

[6] Scott's counsel, both at trial and on appeal, stress S.R.'s "significant" law enforcement background. S.R., however, stated her work for the Department of Justice and the jail was 20 and 30 years earlier, respectively. She was not questioned about the nature of her work for the Department of Justice.

11

the influence of drugs.  Also, S.R. was a social worker--an occupation that concerned prosecutors.

The court then permitted the People's representative to augment the record or comment.  The prosecutor indicated she had written down the same reasons as the court for challenging these jurors.  Further, she noted that M.C., the African-American male, was an acceptable juror but he was excused by the defense.

　　　　2.  The Law

"Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias.  (*Batson, supra*, 476 U.S. at p. 89, 106 S.Ct. 1712; *Wheeler, supra*, 22 Cal.3d at pp. 276–277, [ ].)  Recently, 'the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendants are made.  "First, the defendant must make out a prima facie case by 'showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'  [Citations.]  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination.'  [Citation.]" '  [Citation.]  The high court clarified that 'a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.'  [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1100; accord *People v. Williams* (2013) 56 Cal.4th 630, 649.)

We consider the entire record before the trial court in deciding whether a prima facie case was stated, but certain types of evidence may be especially relevant, such as whether the opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptory challenges against

the group; that the jurors in question share only the characteristic of their membership in the group; and whether the opponent failed to engage these same jurors in more than desultory voir dire.  (*People v. Bonilla* (2007) 41 Cal.4th 313, 342 (*Bonilla*).)

"Although the prosecutor's excusal of all members of a particular group may give rise to an inference of impropriety, especially if the defendant belongs to the same group, that inference, as we have observed, is not dispositive.  [Citations.]" (*People v. Crittenden* (1994) 9 Cal.4th 83, 119.)  "'As a practical matter, however, the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion.'  [Citations.]" (*Bonilla, supra,* 41 Cal.4th at p. 343.)  "[T]he small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible." (*Ibid*.)

The three-step *Batson* analysis "is not so mechanical that the trial court must proceed through each discrete step in ritual fashion." (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 500.)  "Though not strictly required, it is the better practice for the trial court to have the prosecution put on the record its race-neutral explanation for any contested peremptory challenge, even when the trial court may ultimately conclude no prima facie case has been made out." (*Bonilla, supra*, 41 Cal.4th at p. 343, fn. 13.)

"When a trial court denies a *Wheeler* motion without finding a prima facie case of group bias, the appellate court reviews the record of voir dire for evidence to support the trial court's ruling.  [Citations.]  We will affirm the ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question.  [Citation.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 135.)  "Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with 'considerable deference' on appeal.  [Citation.]" (*People v. Howard* (1992) 1 Cal.4th 1132, 1155.)

3. Analysis

Scott contends he demonstrated a prima facie case of discrimination because the People used peremptory challenges to remove two of the three African-American

13

prospective jurors. He argues these two prospective jurors gave pro-prosecution answers, supporting the inference that they were removed for discriminatory reasons.

Although the trial court did not use the term "prima facie case," we read the record to show that the trial court found Scott failed to make a prima facie case. We agree with the trial court that the record of voir dire provides race-neutral reasons for excusing P.M. and S.R. and Scott failed to provide evidence sufficient to support an inference of discrimination.

Relying on Ninth Circuit cases (*Johnson v. Finn* (9th Cir. 2011) 665 F.3d 1063, 1069; *Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102, 1107-1108), Scott contends the trial court erred in considering what it perceived as race-neutral reasons for removing these jurors. As he recognizes, however, our Supreme Court has held that such consideration is appropriate and we are bound to follow our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456.) Our Supreme Court has repeatedly considered race-neutral reasons appearing on the record to find that no prima facie case was established. (E.g., *People v. Streeter* (2012) 54 Cal.4th 205, 225 [where record of voir dire showed race-neutral reasons for recusal of three African-American prospective jurors, no inference of discriminatory purpose]; *People v. Davis* (2009) 46 Cal.4th 539, 584 [no inference of discrimination where "obvious race-neutral grounds" for challenges to five Hispanic-named prospective jurors]; *People v. Avila* (2006) 38 Cal.4th 491, 554 [prospective juror's answers "disclosed a number of 'reasons other than racial bias for *any* prosecutor to challenge her'"].)

Here, the prosecutor raised her concerns about P.M. and S.R. in questioning them. This is not a case where the excused jurors were asked no or only perfunctory questions, the type of evidence that supports an inference of discrimination. (See *People v. Kelly* (2007) 42 Cal.4th 763, 779.) The primary concern with P.M. was her brother's lengthy sentence for burglary. As P.M. stated, she would not see him again. Although P.M. professed that neither she nor her parents "had a problem" with the sentence, his fate was

14

a legitimate, race-neutral concern.[7] The race-neutral reasons for excusing S.R. were even stronger. As we noted *ante,* Scott exaggerates S.R.'s law enforcement background, which was decades in the past. She had a degree in social work and "[p]eremptory challenges based on a juror's experience in counseling or social services is a proper race-neutral reason for excusal. [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 907-908.) Her brother was facing prosecution by the same district attorney and was housed in the same jail as Scott, and she intended to see him--a fact emphasized by the People and the trial court. We also find highly significant the fact that she hesitated before saying there would be no spillover effect from her brother's case into the current case. Further, she partially excused her brother's behavior as being due to drug addiction, suggesting she might be sympathetic to a defendant where, as here, drugs were involved, and that she did not have the strict personal responsibility mindset a prosecutor would tend to prefer. " 'One of the most regular uses of peremptory strikes is to eliminate from the final jury venire persons whom either side believes will be too sympathetic to his opponent.' [Citation.]" (*People v. Dunn* (1995) 40 Cal.App.4th 1039, 1054.)

The dismissal of two prospective jurors is too small a sample alone to show a pattern of discrimination. (*Bonilla, supra,* 41 Cal.4th at p. 343.) Moreover, the People did not excuse all African-American prospective jurors. M.C. was an acceptable juror who was excused by the defense. That the People accepted him was an indication that the exclusion of P.M. and S.R. was not due to their race. (See *People v. Lenix* (2008) 44 Cal.4th 602, 629 [People's acceptance of panel with Black juror strongly suggests race not a motive].)

---

[7] Scott challenges the trial court for misstating P.M.'s testimony as expressing a concern that her parents would miss her brother due to his incarceration. He also claims the trial court improperly found P.M. raised the issue of three strikes when in fact her reference was in response to the court's question. We find the record shows race-neutral reasons for excusing P.M. and S.R. without relying on the challenged observations.

15

Our consideration of the relevant factors and review of the record fail to support an inference that the People excused either P.M. or S.R. on the basis of her race. The trial court did not err in denying Scott's *Batson-Wheeler* motion.

B. *Sufficiency of the Evidence of Attempted Robbery*

Scott contends there was insufficient evidence of attempted robbery to support the conviction on count two or the robbery-murder special circumstance. He argues the evidence shows the intent was to kill Waters based on a motive of gang retaliation with no concurrent intent to rob. While there was evidence of a previous intent to rob Waters, Scott contends that intent shifted to the intent to kill before the robbery plan went beyond mere preparation.

1. The Law

The standard for judicial review of a criminal conviction challenged as lacking evidentiary support is well established: "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence - that is, evidence which is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We accord due deference to the verdict and will not substitute our conclusions for those of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.) A conviction will not be reversed for insufficient evidence unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The crime of attempt requires a specific intent to commit a crime and a direct but ineffectual act done towards its commission. (§ 21a.) "The act must go beyond mere preparation, and it must show that the perpetrator is putting his or her plan

16

into action, but the act need not be the last proximate or ultimate step toward commission of the substantive crime. [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 376.) "Where the intent to commit the crime is clearly shown, an act done toward the commission of the crime may be sufficient for an attempt even though that same act would be insufficient if the intent is not as clearly shown. [Citation.]" (*People v. Bonner* (2000) 80 Cal.App.4th 759, 764.)

"There is, of course, a difference between the preparation antecedent to the commission of an offense and the actual attempt to commit it. The preparation consists in devising or arranging the means or measures necessary for the commission of the offense. The attempt is the direct movement toward the commission after preparations are made and must be manifested by acts which would end in the consummation of the particular offense unless frustrated by extraneous circumstances. [Citations.] Whenever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt. [Citation.]" (*People v. Anderson* (1934) 1 Cal.2d 687, 690 (*Anderson*) (cited with approval in *People v. Watkins* (2012) 55 Cal.4th 999, 1021-1022 (*Watkins*).)

In *Watkins, supra,* 55 Cal.4th 999, our Supreme Court affirmed a conviction of attempted robbery and a robbery-murder special circumstance. Defendant and his companion, after committing two robberies, drove to the covered vehicle entrance of a Holiday Inn and opened the hood of their stolen truck. (*Watkins, supra*, at pp. 1003-1004.) A man who was there with his family waiting on an airport shuttle walked over and looked into the engine area; his family's view of him was obscured. After a minute, he walked hurriedly back to his family and then defendant shot and killed him. (*Id*. at p. 1004.) The high court found the evidence sufficient to show that defendant and his companion unequivocally engaged in a deliberate ruse to lure their victim outside the view of his family so they could rob him. (*Id*. at p. 1023.) That the victim hurriedly walked away from the truck raised the reasonable inference that some act in furtherance

17

of robbery--a demand for money or display of a gun--occurred behind the hood of the truck.  (*Ibid*.)

2.  Analysis

Here, there was substantial evidence from which the jury could find attempted robbery.  The People presented overwhelming evidence of Scott's participation in robberies in general.  Detective Quinn testified one of the primary activities of the FAB gang, of which Scott was an active member, was committing robberies.  The "funk" between FAB and the Elm Street Bloods began with the robbery of Tommy Martinez.  Numerous text messages sent by Scott discussed robberies or licks.  He also sent text messages about his need for money.  Rap lyrics found in Scott's apartment referred to shooting someone and taking his money.

Further, there was evidence that Scott went with the others to Waters's apartment to rob him.  A few days before the shooting, Grant had texted Scott that Waters "hit the dice" game for $4,000, suggesting he had money.[8]  Further, Waters was a drug dealer and thus likely to have drugs or money or both.  Earlier that evening, Grant sent Scott a message that they would "hit Mark tonight," an ambiguous phrase that could refer to either a robbery or a murder (or assault).  Gray testified he left May Street with Grant, Scott, and Dixon to "hit a lick."  Grant brought up the robbery, but all four were present when it was discussed.  They first went to an AM/PM minimarket for gas; everyone chipped in money and Scott bought the gas.  Then they drove to the Woodbridge Apartments, where Gray parked, backing in for a quick getaway, and the others got out.  Scott approached Waters's car and fired multiple times.

---

[8]  Scott argues there was no reason to rob Waters because he had spent his money on a car and he and his companions saw Waters and his car the day of the shooting.  We are not convinced that these defendants put this degree of careful thought into their actions.

18

Scott contends the evidence of a gang retaliation motive, to avenge the earlier shooting of Scott and Grant, shows his intent was murder. McGrigg testified the shooting began immediately. No property was taken from Waters either before or after the shooting, and there was no discussion of robbery afterwards. Scott also relies on Gray's testimony that he and Dixon "got played;" they were told it was a robbery when it was actually murder. The jury, however, was not required to accept entirely Gray's version of events. (*People v. Allen* (1985) 165 Cal.App.3d 616, 623 [jury entitled to reject some portions of a witness's testimony while accepting others].) "That the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial. [Citation.]" (*People v. Holt* (1997) 15 Cal.4th 619, 669.) Further, the jury could have found Scott had dual intents when he approached Waters.

Scott contends any intent to rob had been abandoned in the preparation stage. He argues there was no evidence of an attempted robbery "thwarted by some extraneous circumstance." Where the circumstance that prevents completion of the robbery is a change of heart by the perpetrator there can still be an attempt. (*People v. Dillon* (1983) 34 Cal.3d 441, 455 ["when the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force, the attempt is underway, and a last-minute change of heart by the perpetrator should not be permitted to exonerate him"].)

Scott distinguishes the cases on which the People rely to show attempted robbery and argues any plan to rob Waters never went beyond mere preparation. We find *Anderson, supra,* 1 Cal.2d 687, controlling. In *Anderson*, defendant, who had that same month engaged in a three robberies using a gun, approached the ticket office of the Curran Theater with the admitted intent to commit a robbery. When he was within two feet of the office, he pulled out a gun. Defendant testified the gun "went off." (*Anderson, supra,* at p. 689.) Our Supreme Court found defendant's actions went beyond mere preparation. "[W]hen he 'walked in there [Curran Theater entrance] about two feet

19

from the grill' and 'pulled out the gun' and 'was just going to put it up in the cage when it went off,' we are satisfied that his conduct passed far beyond the preparatory stage and constituted direct and positive overt acts that would have reasonably tended toward the perpetration of the robbery had the gun not exploded, for one reason or another, and frustrated the plan to consummate the offense. We see no escape from the conclusion that defendant's conduct constituted an attempt to commit robbery." (*Id.* at p. 690.)

While Scott did not admit the intent to rob, as the defendant did in *Anderson*, the jury could conclude from the evidence just outlined that Scott had the intent to rob Waters when he approached him with his gun. As in *Anderson,* his actions went beyond preparation; the robbery was thwarted only by the firing of the gun "for one reason or another," and constituted attempted robbery. Sufficient evidence supports Scott's conviction for attempted robbery and the robbery-murder special circumstance.

C. *Motion for a New Trial*

Prior to sentencing, Scott made an oral motion for a new trial on the basis that attempted robbery had not been proven. The People opposed the motion, arguing the evidence amply supported the jury's verdict. The trial court denied the motion. "The court finds that there was clearly evidence to support the jury verdict regarding the special circumstance enhancement of murder in the course of an attempted robbery."

Scott contends that even if this court finds substantial evidence of attempted robbery, we should reverse the trial court because it applied the wrong standard in denying his oral motion for a new trial. He contends the trial court abused its discretion by employing the substantial evidence standard, rather than properly weighing the evidence independently. (See *People v. Knoller* (2007) 41 Cal.4th 139, 156 [abuse of discretion to base decision on incorrect legal standard].)

A court may grant a new trial when the verdict is contrary to the evidence. (§ 1181, subd. (6).) "The court extends no evidentiary deference in ruling on a section 1181(6) motion for new trial. Instead, it independently examines all the evidence to

20

determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' [Citations.]" (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133, original italics.)

"In reviewing a motion for a new trial, the trial court must weigh the evidence independently. [Citation.] It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court 'should [not] disregard the verdict ... but instead ... should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' [Citation.] [¶] A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. '"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 523–524.)

We find no abuse of discretion in the trial court's denial of Scott's motion for a new trial because we reject Scott's contention that the trial court applied the wrong standard. Although the trial court did not *expressly* state it had independently examined the evidence and found it sufficiently credible to prove each element of attempted robbery beyond a reasonable doubt, given the presumption in favor of the trial court's ruling and the deferential abuse of discretion standard, we read the trial court's statement to mean exactly that. In this context, a reasonable interpretation of "the court finds" is that the trial court was expressing its own independent view that the evidence established each element of attempted robbery. Scott offers no reason why the trial court would have viewed the evidence, which we have found to be sufficient, any differently than the jury.

D. *Instructional Error: Discharge of Firearm Enhancement*

Section 12022.53(d) enhances the sentence, by an additional term of 25 years to life, of anyone who, in the commission of specified felonies, including murder and

attempted robbery (§ 12022.53, subd. (a)(1), (4), (18)), "intentionally and personally discharged a firearm and proximately caused great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice ...." The jury found this enhancement true as to both the murder and attempted robbery charges.

Scott contends the enhancements must be reversed due to instructional error. He contends the trial court erred by including irrelevant and misleading instructions on accomplices and group liability and by failing to define proximate causation. He contends these errors permitted the jury to find the enhancement true based solely on acts of an accomplice (Grant). He asserts the instructional error affected his substantial rights because it lowered the prosecution's burden of proof. (See § 1259 [instruction reviewable without objection where defendant's substantial rights affected].) Scott's argument is premised on his view that the jury could have concluded from the evidence that Grant fired the .22, which contained the only bullets that struck Waters.

      1. The Instructions

The trial court instructed the jury with the language of CALCRIM No. 3149 as follows:

"If you find the defendant guilty of the crimes charged in Counts One or Two, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally and intentionally discharged a firearm during that crime causing great bodily injury or death. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.

"To prove this allegation, the People must prove that:

"1. The defendant personally discharged a firearm during the commission of that crime;

"2. The defendant intended to discharge the firearm; and

"3. The defendant's act caused great bodily injury to or the death of a person.

"The term firearm is defined in another instruction.

22

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.

"A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

"There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death.

"A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death.

"A person is an *accomplice* if he or she is subject to prosecution for the identical crime charged against the defendant. A person is subject to prosecution if he or she committed the crime or if:

"1. He knew of the criminal purpose of the person who committed the crime; and

"2. He intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime or participate in a criminal conspiracy to commit the crime.

"The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

The court also instructed with the language of CALCRIM No. 3160 as follows:

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"If you conclude that more than one person shot Perell Waters and you cannot decide which person caused which injury, you may conclude that the defendant personally inflicted great bodily injury on Perell Waters if the People have proved that:

"1.  Two or more people, acting at the same time, shot Perell Waters and inflicted great bodily injury on him;

"2.  The defendant personally used physical force on Perell Waters during the group assault; and

"3.  The amount or type of physical force the defendant used on Perell Waters was enough that it alone could have caused Perell Waters to suffer great bodily injury.  The defendant must have applied substantial force to Perell Waters.  If that force could not have caused or contributed to the great bodily injury, then it was not substantial."

### 2.  Causation

This enhancement requires that a defendant *personally* discharge a firearm, but only that he *proximately* cause great bodily injury or death.  (*People v. Bland* (2002) 28 Cal.4th 313, 336 (*Bland*).)  "A person can proximately cause a gunshot injury without personally firing the weapon that discharged the harm-inflicting bullet."  (*Id*. at p. 337.)  The *Bland* court approved a previous instruction that defined proximate cause as "an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the great bodily injury or death and without which the great bodily injury or death would not have occurred."  (*Id*. at pp. 335, 338.)

Here the trial court instructed with the updated CALCRIM No. 3149 instruction that does not use the term "proximate cause."  The instruction did, however, inform the jury that *defendant's* act had to cause great bodily injury or death, and that for an act to cause death, death must be "the direct, natural, and probable consequence of the act and the death would not have happened without the act."  This instruction was sufficient to adequately convey the concept of proximate causation as set forth in *Bland*.

The *Bland* court also held that where there may be more than one cause of death, the jury should be instructed on concurrent causes.  (*Bland, supra,* 28 Cal.4th at p. 335.)  At that time, the standard instruction was CALJIC No. 3.41.  (*Ibid*.)  Here, the court read the jury CALCRIM No. 3160, set forth *ante*, which instructed it how to determine

24

whether Scott was responsible for the infliction of great bodily injury if there was more than one shooter.[9]

Scott contends CALCRIM No. 3160 is flawed because it permitted the jury to find the necessary causation if he "personally used physical force" during a group assault. He argues this instruction permitted the jury to find the enhancement true without finding that he proximately caused great bodily injury or death. But the instruction required that Scott's physical force on Waters be "enough that it alone could have caused Perell Waters to suffer great bodily injury." The force must have been substantial, causing or contributing to the great bodily injury. '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016 (*Castillo*).) Further: "In reviewing a claim of error in jury instructions in a criminal case, this court must first consider the jury instructions as a whole to determine whether error has been committed. [Citations.] We may not judge a single jury instruction in artificial isolation, but must view it in the context of the charge and the entire trial record." (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1330-1331 (*Moore*).)

### 3. Accomplice

This enhancement does not apply if the death or great bodily injury is to an accomplice. (§ 12022.53, subd. (d).) The trial court deleted the reference to an accomplice in setting forth the elements to be proved, but included the definition of an accomplice. Scott contends that merely including the *definition* of an accomplice

---

[9] The infliction of death would constitute the infliction of great bodily injury. (See *People v. Gonzales* (1994) 29 Cal.App.4th 1684, 1694 [gross vehicular manslaughter while intoxicated is a serious felony under section 1192.7, subdivision (c)(8)--inflicting great bodily injury], called into doubt on other grounds in *People v. Reed* (1996) 13 Cal.4th 217, 229.)

25

permitted the jury to find the enhancement true based solely on Scott's accomplice status. We disagree.

Although the definitional instruction was out of place as positioned, the trial court advised the jurors that not all of the instructions were necessarily applicable. Further, it advised the jurors not to assume that an instruction applied merely because it was provided to them. (See CALCRIM No. 200.) In the absence of evidence to the contrary, we presume the jurors found the accomplice instruction inapplicable and simply disregarded it. (Cf. *People v. Pride* (1992) 3 Cal.4th 195, 249 [inapplicable instruction on consciousness of guilt from effort to suppress evidence was "at worst" superfluous and harmless].)

Giving a superfluous instruction raises a concern only where there is a serious concern that the instruction misled the jury. "When reviewing a purportedly ambiguous jury instruction, we ask whether there is a reasonable likelihood the jury misconstrued or misapplied the challenged instruction. [Citations.]" (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156.) In making this determination, we consider the entire charge to the jury. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) Here we find no reasonable likelihood the jury was misled. The jury could not have reasonably determined the enhancement was true based solely on Scott's accomplice status because the instruction clearly stated that the People had to prove that Scott personally and intentionally discharged a firearm, and "[t]he defendant's act caused great bodily injury to or the death of a person." This language, directing the jury to consider *Scott's* act, distinguishes this case from *People v. Carrillo* (2008) 163 Cal.App.4th 1028 (*Carrillo*), on which Scott relies.

In *Carrillo*, several persons fired at the victim, who was hit by rounds from two or three different guns, but there was no evidence Carrillo fired one of those guns. (*Carrillo, supra,* 163 Cal.App.4th at p. 1037.) The trial court instructed on causation using the same language as here, but instructed that the "defendant's *or* a perpetrator's

26

act caused great bodily injury to or the death of a person." (*Id*. at p. 1036, original italics.) Thus, in *Carrillo*, the jury instructions permitted the jury to find the enhancement true without finding that the defendant proximately caused death or great bodily injury.[10] That is not the case here, where the instruction required that the jury find that Scott caused great bodily injury or death to find the enhancement true. There was no prejudicial error.

E. *Parole Revocation Fine*

Scott contends the trial court erred, and imposed an unauthorized fine, by imposing a parole revocation fine in a case where there is no parole eligibility. The People properly concede the error. The parole revocation fine must be stricken.

Section 12045.5 provides for a fine equal to the restitution fine under section 1202.4 "[i]n every case where a person is convicted of a crime and whose sentence includes a period of parole." The parole revocation fine may not be imposed where defendant is sentenced to life in prison without parole. (*People v. Battle* (2011) 198 Cal.App.4th 50, 63; *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1097 (*Ybarra*); *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183.)

F. *Correction of Abstract*

Finally, Scott contends the indeterminate abstract must be corrected to reflect the actual date of his sentencing. Scott was sentenced on June 10, 2011. The determinate abstract properly reflects this date, but the indeterminate abstract shows a sentencing date of September 10, 2011. The People agree the abstract should be corrected to show the

---

[10] In *Carrillo*, the court found instructional error, but found that error harmless because in finding Carrillo guilty of murder, the jury found his acts caused the victim's death. "Regardless of whether the jury found Carrillo guilty because he fired the fatal shot or aided and abetted the murder by firing at Ramirez, under *Bland* and [*People v*.] *Sanchez* [(2001) 26 Cal.4th 834], he was a proximate cause of the death. (*Carrillo, supra*, at p. 1038.)

accurate sentencing date. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [court has inherent power to correct clerical errors in its records].) We order the indeterminate abstract of judgment corrected to show the correct sentencing date.

## II

### *Dixon's Contentions*

A. *Sufficiency of the Evidence of First Degree Murder*

Dixon contends his conviction for felony murder must be reversed for insufficient evidence. He asserts that due to the manner in which the trial court instructed the jury, coupled with the People's argument on this issue, the jury was required to find that he aided and abetted or conspired with Scott and Grant to rob Waters. Dixon then argues there is insufficient evidence of felony murder under either theory--aiding and abetting or conspiracy--because Scott and Grant intended to *kill* Waters, not *rob* him.

1. Background

Dixon told the police that the robbery was Scott's idea. Waters had drugs and $4,000 from a dice game. Dixon said the others told him if he came, he would get half the money. He admitted that his girlfriend probably knew he was there for a "lick." On appeal, Dixon concedes there is sufficient evidence to sustain his conviction for attempted robbery.

In closing argument, the People acknowledged that Dixon never fired a shot. The prosecutor argued that Dixon was guilty of felony murder under any of three theories: if he attempted to commit a robbery which resulted in a death, or if he aided and abetted the robbery, or conspired to commit robbery. The prosecutor also referred to Gray and called him an aider and abettor.

The trial court instructed the jury on first degree felony murder based on the three theories outlined by the prosecutor. It also instructed on the law of aiding and abetting and conspiracy. It gave the jury several instructions on the felony murder special circumstance. The instruction on the required intent of an accomplice included the

following language:  "In order to prove the special circumstance for a defendant who is not the actual killer but who is guilty of first degree *murder as an aider and abettor or a member of a conspiracy . . .*"

2. Analysis

The premise of Dixon's contention--that the jury *had to* find he was an aider and abettor or a member of a conspiracy to find him guilty of first degree felony murder-- fails.  The felony murder instruction (CALCRIM No. 703) made clear that the People could prove felony murder by proving Dixon attempted or intended to commit robbery and, while attempting to commit robbery, another person (the perpetrator) caused the death of another person.  Although the People repeatedly referred to the alternate theories of aiding and abetting and conspiracy in their argument, it is clear that their primary theory of Dixon's guilt was that Dixon attempted a robbery.  Because Dixon admitted he intended to commit robbery and concedes there is sufficient evidence he committed attempted robbery, and it is undisputed that Scott or Grant killed Waters during that attempt, there is sufficient evidence to sustain Dixon's conviction for felony murder.

To the extent Dixon argues the felony murder special circumstance cannot stand because CALCRIM No. 703 requires he be, if not the actual killer, an aider and abettor or a member of a conspiracy, and he was proven to be neither, we disagree.  The instruction included all three theories of liability, that Dixon "attempted to commit, or aided and abetted an attempt to commit, or was a member of a conspiracy to commit a robbery."  As we noted *ante*, we review the entire instruction for content and context, and also consider the instructions in their entirety.  (See *Castillo, supra,* 16 Cal.4th at p. 1016; *Moore, supra,* 44 Cal.App.4th at pp. 1330-1331.)

Dixon argues the jury must have *believed* it was required to find Dixon was an aider and abettor or a member of a conspiracy because it deliberated for more than five days.  The People argued that if Dixon went to the apartments with the intent to commit a robbery and attempted to commit a robbery, and in the course of that attempt, Waters was

29

shot and killed, Dixon was guilty of felony murder. "Simple as that." Dixon contends the long deliberations showed the jury did not find it so simple.

It is true that the Dixon jury was the first of the three juries to receive the case and the last to deliver a verdict. The record, however, indicates several reasons for the delay. The Dixon jury received the case the afternoon of May 5, 2011 and deliberated all day May 6 and 9. On the morning of May 10, an issue of juror misconduct was brought to the court's attention. A juror was replaced that afternoon and deliberations began anew. The first full day of renewed deliberations, the jury asked a question about the firearm enhancement and later expressed safety concerns. The second day, it reached verdicts. Considering "the totality of relevant circumstances," the length of the jury deliberations here does not establish that this was a close case. (See *In re Pratt* (1999) 69 Cal.App.4th 1294, 1322 [length of jury deliberations "permits more than a single interpretation"].)

In any event, the record reflects sufficient evidence that Dixon aided and abetted Scott and Grant in the attempted robbery. "To prove that a defendant is an accomplice, . . ., the prosecution must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) Dixon challenges only the criminal purpose of Scott and Grant; he contends their purpose was murder, not robbery. As discussed in Part I. B., *ante,* there was sufficient evidence that Scott and Grant intended to rob Waters and took a substantial step. Scott and Grant had robbed before; they learned that Waters had money and Dixon told the police Waters also had marijuana. Gray testified the four of them discussed the robbery that day. Dixon told the police the robbery was Scott's idea and he was promised half the proceeds.

Sufficient evidence supports the first degree felony-murder conviction.

30

B.  *Sufficiency of the Evidence of the Felony Murder Special Circumstance*

Dixon contends insufficient evidence supports the felony-murder special circumstance.  He contends there is insufficient evidence that he was a major participant in the attempted robbery or that he acted with reckless indifference to life.

1.  The Law

Where the defendant is not the actual killer, section 190.2, subdivision (d) sets forth the required intent for a felony-murder special circumstance allegation.  "This provision was added to existing capital sentencing law in 1990 as a result of the passage of the initiative measure Proposition 115, which, in relevant part, eliminated the former, judicially imposed requirement that a jury find intent to kill in order to sustain a felony-murder special-circumstance allegation against a defendant who was not the actual killer. [Citation.]  Now, pursuant to section 190.2(d), in the absence of a showing of intent to kill, an accomplice to the underlying felony who is not the actual killer, but is found to have acted with 'reckless indifference to human life and as a major participant' in the commission of the underlying felony, will be sentenced to death or life in prison without the possibility of parole.  [Citation.]

"The portion of the statutory language of section 190.2(d) at issue here derives verbatim from the United States Supreme Court's decision in *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127] (hereafter *Tison*).  In *Tison*, the court held that the Eighth Amendment does not prohibit as disproportionate the imposition of the death penalty on a defendant convicted of first degree felony murder who was a 'major participant' in the underlying felony, and whose mental state is one of 'reckless indifference to human life.' (*Tison, supra*, 481 U.S. at p. 158 & fn. 12 [95 L.Ed.2d at pp. 144-145].)  The incorporation of *Tison's* rule into section 190.2(d)--in express terms--brought state capital sentencing law into conformity with prevailing Eighth Amendment doctrine." (*People v. Estrada* (1995) 11 Cal.4th 568, 575 (*Estrada*).)

These two requirements--being a major participant and having a reckless disregard for human life--will often overlap.  (*Tison, supra,* 481 U.S. at p. 158, fn. 12 [95 L.Ed.2d at p. 145.])

Our Supreme Court has defined a "reckless indifference to human life."  *Estrada* held that " 'reckless indifference to human life' is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death.  The common meaning of the term 'indifference,' referring to 'the state of being indifferent,' is that which is 'regarded as being of no significant importance or value.'  (Webster's New Internat. Dict. (3d ed. 1981) p. 1151, col. 1.)  To *regard* something, even to regard it as worthless, is to be aware of it.  (See *id.* at p.1911, col. 1 ['regard' is synonymous with 'consider, evaluate, judge'].)"  (*Estrada, supra*, 11 Cal.4th at p. 577.)

This court has defined "major participant."  "In this context, we believe the phrase 'major participant' is commonly understood and is not used in a technical sense peculiar to the law.  The common meaning of 'major' includes 'notable or conspicuous in effect or scope' and 'one of the larger or more important members or units of a kind or group.' (Webster's New Internat. Dict. [(3d ed. 1971)] p. 1363.)"  (*People v. Proby* (1998) 60 Cal.App.4th 922, 933 (*Proby*).)  A major participant is not limited to the ringleader.  (*Id.* at p. 934.)

We review a challenge to the sufficiency of the evidence to support a special circumstance finding under the same standard we use to review the sufficiency of the evidence to support a conviction.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1229; *People v. Mayfield* (1997) 14 Cal.4th 668, 790-791.)

2.  Analysis

Dixon contends no evidence supports a finding that he was a major participant. He argues no evidence demonstrated that he was involved in the "funk" between FAB and the Elm Street Bloods or that he had ever been in Scott's presence before that day.

He notes he was quiet in the car on the way to the Woodbridge Apartments and was not armed.

A defendant need neither be armed nor participate in the actual taking to be a major participant in a robbery murder. In *People v. Hodgson* (2003) 111 Cal.App.4th 566, 568 (*Hodgson*), defendant "held open the electric gate of an underground parking garage of an apartment complex to facilitate the escape of his fellow gang member who had robbed and shot to death a woman just after she opened the gate with her key card. A jury convicted him of first degree murder and first degree robbery and found true the special circumstance allegation the murder was committed during the commission of a robbery." Although defendant's involvement in the underlying crimes was "not as extensive as in other cases upholding robbery-murder special-circumstance findings," and defendant was not armed and did not take the stolen property, the court found sufficient evidence he was a major participant in the crimes. (*Hodgson, supra,* 111 Cal.App.4th at p. 579.) There was not a large group or several accomplices, only defendant and his cohort, so his role was more essential. By slowing down the closing of the electric gate, defendant was instrumental in assisting the actual killer to escape. (*Id.* at p. 580.) Because defendant was the only person assisting the actual killer, "his actions were both important and conspicuous in scope and effect." (*Ibid.*) In *People v. Smith* (2005) 135 Cal.App.4th 914, 928 (*Smith*), defendant was a major participant in an attempted robbery where he was one of only three robbers and served as the only lookout, standing outside the motel room where the attempted robbery turned murder occurred.

Here, Dixon willingly agreed to participate in a robbery; although he was not armed, he knew Scott and Grant had guns. He was one of the three who got out of the car to rob Waters. He told the police he was promised a substantial portion of the proceeds, indicating he believed his role was major. After the killing, Dixon allowed the others into his girlfriend's apartment to escape the police and clean their guns. From this evidence, the jury could properly conclude Dixon's role was "notable and conspicuous."

33

There was also evidence of Dixon's reckless indifference to human life. Dixon agreed to participate in a robbery knowing that both Scott and Grant had guns. He was aware that the use of a gun to effectuate robbery presents a grave risk of death. (*Estrada, supra*, 11 Cal.4th at p. 577.) Further, after the shooting began, he fled and then offered shelter to the others to escape the police. A reckless indifference to human life has been found where a defendant knows someone has been shot or injured and flees instead of helping the victim. (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1117; *Smith, supra,* 135 Cal.App.4th 927; *Hodgson, supra,* 111 Cal.App.4th at p. 580.)

Sufficient evidence supports the felony-murder special circumstance.

C. *Sentencing Remand*

In sentencing Dixon, the trial court "ordered that the defendant serve the penalty which is prescribed by law, which is life without the possibility of parole." The trial court followed the probation report, repeating its language. Counsel did not raise the option of a lesser sentence. Because Dixon was only 17 at the time of the crime, under section 190.5, subdivision (b), the trial court had discretion to impose a sentence of 25 years to life in prison.[11] Section 190.5 requires "a proper exercise of discretion in choosing whether to grant leniency and impose the lesser penalty of 25 years to life for 16– or 17–year–old special circumstance murderers." (*People v. Guinn* (1994) 28 Cal.App.4th 1130, 1149.) Dixon contends that the trial court was unaware of its sentencing discretion and therefore the matter must be remanded for resentencing.[12] We

---

[11] Section 190.5, subdivision (b) provides: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

[12] At oral argument the People repeatedly--and erroneously--asserted that Dixon did not challenge his particular sentence or request remand; in fact he did both.

agree that the trial court must be aware of the scope of its discretionary powers in order to exercise informed discretion.  (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.)

In *Ybarra, supra,* 166 Cal.App.4th 1069, the probation report indicated the established sentence for the 17-year-old defendant's crime of special circumstance murder was life without parole (LWOP) and that was the sentence the trial court imposed.  (*Ybarra, supra,* 166 Cal.App.4th at p. 1093.)  The reviewing court held that "[s]ince the record explicitly shows a lack of meaningful argument by counsel about the facts and the law and implicitly shows a belief by the court and counsel alike that an LWOP term was mandatory if the special circumstance were not stricken, our deferential review shows that a remand for resentencing . . . is imperative." (*Ybarra, supra,* at p. 1094.)  Here, the record does not establish that the trial court was aware of, and exercised, its discretion.

The People argue Dixon forfeited his claim because he did not object to the sentence below.  The People ask this court not to follow *Ybarra*, arguing, "There is no reason not to apply the forfeiture rule to a trial court's failure to reduce appellant's sentence."  We disagree.  The consequences to the minor of receiving the most severe punishment possible without consideration of an available lesser sentence are too great to find forfeiture.  At oral argument, even the People recognized the forfeiture argument was made against "overwhelming odds" that it would fail.  Further, where the record does not indicate that the sentencing court was aware of, and exercised, its discretion, remand is required. (*People v. Meloney* (2003) 30 Cal.4th 1145, 1165.)  We will remand Dixon's case for resentencing.

In a supplemental brief, Dixon contends that if this court finds the trial court understood its sentencing discretion, remand is still necessary.  He argues that remand is required because section 190.5, subdivision (b), creates an unconstitutional presumption in favor of an LWOP sentence in violation of *Miller.*  *Miller* held mandatory sentences of LWOP for juveniles violate the Eighth Amendment's prohibition against cruel and

35

unusual punishment. (*Miller, supra,* __ U.S. ___[183 L.Ed.2d at pp. 418, 424.) The high court did not foreclose imposing that harshest sentence on juveniles in homicide cases, but required the sentencer "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra,* __ U.S. at p. ___ [183 L.Ed.2d at p. 424], fn. omitted.)**13** The court also cautioned that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." (*Ibid.*)

The issue of whether section 190.5, subdivision (b) creates a presumptive or "generally mandatory" sentence that violates the Eighth Amendment under *Miller* is currently before our Supreme Court. (See *People v. Moffett* (2012) formerly at 209 Cal.App.4th 1465, review granted Jan. 3, 2013, S206771; *People v. Gutierrez* (2012) formerly at 209 Cal.App.4th 646, review granted Jan. 3, 2013, S206365.) Until our Supreme Court provides further guidance on whether sentencing a juvenile to LWOP under section 190.5 implicates the constitutional concerns raised in *Miller*, we will adhere to the view of this court (and other courts) that a sentencing court must consider the *Miller* sentencing factors before imposing a sentence of life without the possibility of parole on a juvenile. (See *People v. Siackasorn* (2012) formerly at 211 Cal.App.4th 909, 914-916, review granted Mar. 20, 2013, S207973.)

For the first time in his reply brief, Dixon briefly referenced section 1170, subdivision (d)(2). The reference was to illustrate Dixon's argument that legislative trends were in line with *Miller*. There was some discussion at oral argument as to

---

**13** Under *Miller*, the sentencing court should consider the juvenile's "chronological age and its hallmark features--among them, immaturity, impetuosity, and failure to appreciate risks and consequences," "the family and home environment that surrounds him," "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him," and "the possibility of rehabilitation." (*Miller, supra,* __ U.S. ___ [183 L.Ed.2d at p. 423].)

36

whether *Miller* applies to section 190.5 in light of the opportunity to petition for resentencing afforded by section 1170, subdivision (d)(2). We decline to address the issue of the applicability of *Miller* to section 190.5 in light of section 1170, subdivision (d)(2). First, the issue was raised too late. (See *People v. Thompson* (2010) 49 Cal.4th 79, 110, fn. 3 [new argument at oral argument]; *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 [new point in reply brief].) Second, the issue was not fully developed by the parties. Third, and most importantly, resolution of this issue is unnecessary at this stage of this case. Because we must remand for resentencing, it is uncertain whether Dixon will be sentenced to LWOP, and thus whether section 1170, subdivision (d)(2) will apply to him.

D. *Parole Revocation Fine*

Like Scott, Dixon contends the parole revocation fine must be stricken because his life without parole sentence does not allow for probation. As we discussed in Part I. E., *ante*, Dixon's contention is correct. The parole revocation fine is stricken and, if the trial court imposes an LWOP sentence on remand, it shall not impose a parole revocation fine.

III

*Grant's Contentions*

A. *Admission of Grant's Interrogation by the Police*

Grant contends the trial court erred in admitting into evidence his statements made during police interrogations which culminated in his confession and arrest. He contends his statements were not voluntary; they were obtained through threats to arrest his girlfriend and promises of leniency.

1. First Interrogation

a. Background

Detective Brian Dedonder first questioned Grant on December 16, 2009, the day after the murder. This interrogation was presented to Grant's jury. Grant denied he was a gang member, claimed he did not "know no Marcus [Scott]", and denied any

37

involvement in the shooting, claiming he was home all day. He suggested Scott may have done it and offered to text him and ask if he did it; "nine times out of ten, he would tell me." Frustrated with Grant's lies, Dedonder told him he did not want to involve Grant's girlfriend, but he would arrest her for harboring him if that was what it took to get Grant to tell the truth. Dedonder continued to press Grant to tell the truth. Even after he was allowed to talk to his girlfriend, Grant continued to deny any participation; "all my stories still going to stay the same."

Near the end of the interview, Grant and Dedonder discussed Grant's calling Scott and Grant called him. Scott did not answer that call, but Grant called and spoke with him the next day.

Grant's motion to suppress focused on his second interrogation, which we discuss *post*. Nonetheless, the trial court addressed the first as well. It noted that during this questioning, Grant was permitted to use the restroom, offered water, and permitted to see his grandfather. Grant had previous contacts with the law and the court found he was criminally sophisticated. He did not appear to be under the influence of alcohol or drugs. He did not request to end the interview or assert his right to counsel. The court found no promises of leniency and Grant was not coerced.

> b. Analysis

Grant's contention that his statements were inadmissible because the police threatened to jail his girlfriend is forfeited by his failure to raise it in the trial court. "A defendant ordinarily forfeits elements of a voluntariness claim that were not raised below. [Citations.]" (*People v. Williams* (2010) 49 Cal.4th 405, 435 (*Williams*); see also *People v. Cruz* (2008) 44 Cal.4th 636, 666; *People v. Maury* (2003) 30 Cal.4th 342, 387-388.)

His claim also fails on the merits. Even assuming that Dedonder's threats were coercive, the coercive activity by the police must be the "proximate cause" of defendant's statement. (*People v. Mickey* (1991) 54 Cal.3d 612, 647.) "The statement and the inducement must be causally linked. [Citations.]" (*People v. McWhorter* (2009) 47

38

Cal.4th 318, 347 (*McWhorter*).) There was no causal link here. Dedonder referenced arresting Grant's girlfriend during the first questioning and Grant made no incriminating statements in response. Grant made incriminating statements two weeks later, well into the second interrogation, and without any reference to Grant's girlfriend. Even assuming coercion in Dedonder's reference, the coercion did not give rise to Grant's incriminating statements. (*McWhorter, supra,* 47 Cal.4th at pp. 360-361 [second statement made a week later sufficiently attenuated from coercion of first statement].) Indeed, courts have found sufficient attenuation over a much shorter time period but where the coercive activity was much more egregious. (See *Lyons v. Oklahoma* (1944) 322 U.S. 596, 604, [88 L.Ed. 1481] [a 12-hour interval between an involuntary confession obtained by physical beating and psychological coercion and a subsequent confession constituted sufficient attenuation]; *U.S. v. Patterson* (9th Cir.1987) 812 F.2d 1188, 1189-1190 [a three-hour interval between an involuntary confession obtained by a brutal beating and a subsequent confession constituted sufficient attenuation].)

Grant contends Dedonder impliedly promised him leniency in the first interrogation because he "was recruited to inform" on Scott by setting up a pretext call. Again, this claim is forfeited because Grant did not raise it at trial. (*Williams, supra,* 49 Cal.4th at p. 435.) Also, Grant ignores that he was willing, without police pressure, to blame the shooting on Scott. The pretext call--Grant calling Scott and asking about the shooting--was Grant's idea. He continued to offer to call when the police were reluctant. Thus, any belief by Grant that he would receive leniency was created by Grant, not the police. There was no promise of leniency.

2. Second Interrogation

a. Background

Detectives Dedonder and Jasperson interrogated Grant a second time two weeks later. This interrogation was also presented to Grant's jury. When Grant continued to deny he was present at the shooting, the detectives told him they knew much of what he

39

said was not true and they knew he was at the shooting. They suggested his role may have been less culpable, suggesting he got "sucked" into Scott's plan, helping him out. They could help "minimize" Grant's role if he was not the "main guy." Grant kept responding that if he admitted he was there that meant jail for the rest of his life. The detectives repeatedly assured him that was not necessarily true, every case was judged individually and not all murderers got life.

The police told Grant (incorrectly) that they found gunpowder on his sweatshirt. Jasperson told Grant they could prove he was there with a witness and his cell phone records. Grant continued to focus on spending the rest of his life in prison. Jasperson asked if either detective had said that. "Have the words in jail for the rest of your life ever come out of my mouth?" Grant said he knew people in jail for murder and Dedonder said he had arrested three who received only six years. The detectives again explained each case was evaluated on its facts and they needed to know exactly what happened to evaluate this case. Grant said, "no matter what, I'm getting prison time."

The detectives pressed Grant to cooperate, so they could present his cooperation to the District Attorney. They told him his "bullshit story" made him look terrible, not only a killer but also a liar. Grant complained that he had cooperated in a previous case "and I still got fucked." The detectives replied they were not the last police, this case was more serious, and what happened to him depended on what his intentions were, whether to kill Waters, or just scare him. Cooperation would look good to the district attorney, judge and jury.

Grant was concerned about a prison sentence of any length because of concerns about his safety. "Whether I get life, whether I get six years, it's still, like, what the fuck? ... no matter what, I'm getting prison time." He was afraid of retaliation from Scott. "Nutchy could beat me up. I--I can't beat Nutchy up." Grant was also worried about testifying against Scott. When Jasperson told Grant it was unlikely he would have to testify, Grant began to talk about the shooting.

Grant's inculpatory statements came slowly. First, he admitted he was present, but denied he fired a gun. Grant said he went to the apartments to rob Waters, but Scott wanted to shoot him. Grant said he went up to Waters and said, "I need everything." Finally, Grant admitted he fired into the car.

Before trial, Grant moved to suppress his statements to the police on the basis that they were induced by false promises of leniency. Focusing on his second interview, he argued the police lied to him about his case and then allowed him to back out by suggesting he was not the primary guy. They purported to offer him an opportunity when there was no real opportunity. Grant argued the interrogation crossed the line from voluntary to involuntary. Counsel posited that it could not be said that Grant could not have had a reasonable belief that he might get something out his cooperation.

The People responded that Grant was offered the opportunity to tell his side of the story. It was legal for the police to lie to him about finding gunshot residue on his sweatshirt. They repeatedly told Grant they did not know what the outcome of his case would be.

The trial court denied the motion. The court found the second interrogation was "spirited," but the detectives were not overbearing or coercive. Grant did not request to end the questioning. The court found the detectives' statements about lesser sentences than life in prison were correct because those charged with murder often enter into negotiated pleas for lesser sentences (as Gray did here). The court found nothing in the questioning that rendered Grant's statements inadmissible.

b. The Law

"An involuntary confession may not be introduced into evidence at trial," and "[t]he prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made." (*People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*); also *McWhorter*, *supra,* 47 Cal.4th at p. 346.) "In determining whether a confession was voluntary, '[t]he question is whether defendant's

choice to confess was not "essentially free" because his will was overborne.' [Citation.]" (*People v. Massie* (1998) 19 Cal.4th 550, 576.)

"'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.... Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, "if ... the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible...."' [Citation.]" (*People v. Holloway* (2004) 33 Cal.4th 96, 115.)

"[T]he use of deceptive comments does not necessarily render a statement involuntary. Deception does not undermine the voluntariness of a defendant's statements to the authorities unless the deception is ""'of a type reasonably likely to procure an untrue statement.'"" [Citations.] "'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable."' [Citation.]" (*Williams, supra,* 49 Cal.4th at p. 443.)

An officer's statement that he will help a defendant explain the crime to the police is not an impermissible promise of leniency. (*Carrington, supra,* 47 Cal.4th at p. 170.) Assurances that the police are only attempting to understand defendant's motivation, and suggestions that the homicide might have been an accident, self-defense, or the product of fear are permissible tactics, not coercive. (*Id.* at p. 171.)

42

c. Analysis

Grant contends his expectation of leniency was reinforced in the second interrogation because the detectives repeatedly told him that a murder charge might not result in a life sentence. He argues this representation was untrue because "a murder conviction can only lead to a sentence of life in prison." The record does not show any promise of leniency.

The detectives never promised Grant a lesser sentence if he cooperated; they made clear they did not know what the result would be. More importantly, we see no evidence that Grant's eventual statements about the crime were *induced* by any promise or reasonable expectation of a lesser sentence. Based on his prior experience where he did not receive leniency despite his cooperation, Grant expressed that he did not believe he would receive leniency in this case. Further, Grant remained concerned about receiving a prison sentence of *any* length because of concerns about his safety. He was worried about retaliation from Scott and testifying against him. It was only after Jasperson told Grant it was unlikely he would have to testify, that he began to talk about the shooting.

Grant offered that he had read a book that "happened exactly like to me." The main character was involved in a robbery murder, although he did not want to be, when his friend shot someone. In the book, after meeting a girl, the character prayed and confessed, and "I felt he did the right thing." Grant felt he also had done the "right thing."

The trial court did not err in denying the motion to suppress Grant's statements.

B. *Sufficiency of Evidence of Attempted Murder*

Grant contends there is insufficient evidence of attempted robbery; therefore, both the attempted robbery conviction and the special circumstance must be reversed. He contends the intent of all involved that night had developed into intent to ambush and kill Waters and that any previous intent to rob him had been abandoned.

43

As we discussed in Part I. B., *ante,* there was sufficient evidence of both the intent to rob Waters and an act that went beyond mere preparation. As to Grant, the evidence was even stronger due to his own statements. Grant told his girlfriend to tell the police it was a robbery and that Scott shot Waters. Grant told the police the reason they went to the apartments that night was to "hit a lick" because Waters had money. Although Scott changed his mind and decided to shoot Waters, Grant "wanted to rob him." Grant said he had his gun up when he approached Waters in the car and said, "I need everything." He explained, "That's a lick." There was sufficient evidence of attempted robbery.

C. *Instructional Error: Discharge of Firearm Enhancement*

Grant contends the enhancement for personally discharging a firearm causing death (§ 12022.53, subd. (d)), must be reversed due to instructional error. He contends the instructions permitted the jury to find the enhancement true even though he did not personally fire any bullets that struck Waters. This contention fails. "A person can proximately cause a gunshot injury without personally firing the weapon that discharged the harm-inflicting bullet." (*Bland, supra,* 28 Cal.4th at p. 337.)

Grant also contends that firing into the car did not proximately cause the death of Waters because "given the close proximity of the parties, appellant must have deliberately chosen not to hit Waters." Whether that was true was a factual question for the jury to determine. The jury was entitled to reject Grant's version of events. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 578 [jury entitled to discredit the alternate version of events provided by defendant's friend].)

Finally, Grant contends the instructions, including the instruction defining an accomplice, permitted the jury to find the enhancement true based solely on his accomplice status. For the reasons set forth in Part I. D., *ante,* we reject this contention.

44

# DISPOSITION

As to Grant, the judgment is affirmed.

As to Scott, we direct the trial court to strike the parole revocation fine and to correct the indeterminate abstract of judgment to accurately reflect the sentencing date as June 10, 2011.  The clerk of the superior court is directed to forward a certified copy of the amended and corrected abstracts of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

As to Dixon, we direct the trial court to strike the parole revocation fine and remand the case for resentencing on count one, murder with a special circumstance, in accordance with this opinion.  In all other respects, the judgment is affirmed.

     DUARTE     , J.

We concur:

     NICHOLSON     , Acting P. J.

     MAURO     , J.